**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| CLIMATE PROS, LLC, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | Case No. ___1:22-CV-223___ |
| v. | ) | |
| | ) | |
| GREGORY WADE, | ) | |
| AMANDA ELSON, | ) | |
| ALLIANCE SERVICES OF TEXAS, LLC | ) | |
| | ) | |
| *Defendants.* | | |

---

**PLAINTIFF'S ORIGINAL COMPLAINT**

**TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:**

Plaintiff Climate Pros, LLC ("Climate Pros" or the "Company"), acting by and through its undersigned counsel, files this Complaint against Defendants, and for causes of action would respectfully show as follows:

**NATURE OF THE ACTION**

1.      This is an action for breach of contract, trade secret misappropriation, and tortious interference with contractual relations. The lawsuit arises out of two high-level former executives of Climate Pros breaching their contractual obligations to the Company. The defendants also misappropriated Climate Pros' confidential and trade secret information in violation of their legal duties to the Company.

**PARTIES**

2.      Plaintiff Climate Pros is a Delaware limited liability company with a principal place of business located at 55 N. Brandon Drive, Glendale Heights, Illinois 60139. Climate Pros operates five branch offices in Texas.

3.      Defendant Gregory Wade ("Wade") is a former employee of Climate Pros.  Upon information and belief, Wade is a citizen of Texas, residing at 23800 Lloyd Lane, Hockley, Texas 77447.

4.      Defendant Amanda Elson ("Elson") is a former employee of Climate Pros.  Upon information and belief, Elson is a citizen of Texas, residing at 1903 Sarah Cove, Taylor, Texas 76574.

5.      Defendant Alliance Services of Texas, LLC ("Alliance Services") is a Texas limited liability company, whose registered agent, Mr. Gregory Wade, is located at 23800 Lloyd Lane, Hockley, Texas 77447.  Upon information and belief, Wade is the sole owner of Alliance Services.

## JURISDICTION AND VENUE

6.      This is a suit for a trade secret misappropriation under the Defend Trade Secrets Act (the "DTSA"), 18 U.S.C. § 1836 et seq. and other related Texas common law and statutory claims.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

7.      The Court has supplemental jurisdiction over Climate Pros' state law claims under 28 U.S.C. § 1367(a) because these claims are directly related to the claims in this action within this Court's original jurisdiction and intertwined with the same case or controversy.  Climate Pros' common law claims are substantially related to Climate Pros' claims over which this Court has the original jurisdiction.

8.      This Court has personal jurisdiction over Wade and Elson as they both reside in Texas, worked for Plaintiff in Texas, and breached their statutory, contractual, and common law duties in Texas.  The Court also has personal jurisdiction over Climate Pros' breach of contract claims against Elson because in the agreement at issue she agreed to the jurisdiction of this Court. This Court has personal jurisdiction over Alliance Services as it is a domestic limited liability company.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Climate Pros' claims occurred in this District.

## FACTUAL BACKGROUND

### Climate Pros' Business

10.      Climate Pros is in the business of providing a full spectrum of commercial refrigeration and HVAC services to hundreds of brands and thousands of locations nationwide. Climate Pros' services include, among other things, equipment services and repairs, remote diagnostics, predictive maintenance and reporting, new equipment sales and installation, energy management services, and refrigerant retrofits.

11.      Climate Pros has developed certain proprietary, confidential and trade secret information related to its business and the needs of its customers.  This information is essential to Climate's continuing success.

12.      Climate Pros has expended a substantial amount of time, money, and effort in developing its confidential and trade secret information.

13.      Climate Pros protects the secrecy of its confidential and trade secret information by, among other things, requiring password and two-factor authentication protection of Climate

Pros' computers that have access to or contain such information; password protecting Climate

Pros' databases that contain such information; allowing access to it only to a restricted number of

Climate Pros employees with a specific need to know such information in order to perform their

job functions and who have an obligation to keep the information confidential; maintaining

policies with respect to the use and dissemination of such information; and restricting physical

access to Climate Pros' offices, IT systems, and facilities.

### Wade's Duties at Climate Pros and His Access to Climate Pros' Confidential and Trade Secret Information.

14.     On May 1, 2019, Climate Pros entered into an Asset Purchase Agreement ("APA")

with Tri-Temp Refrigeration, Inc. ("Tri-Temp") and its two shareholders.

15.     Under the terms of the APA, Climate Pros purchased assets of Tri-Temp.

16.     Prior to the acquisition of Tri-Temp by Climate Pros, Defendant Wade, son of one

of the owners of Tri-Temp, had been employed by Tri-Temp for more than 30 years.

17.     Following the acquisition, Wade became an executive of Climate Pros, assuming a

role of Branch Operation Manager for the Company's Houston branch office.

18.     In November of 2019, Climate Pros promoted Wade to the role of Regional

Director of Construction, the position he held at the time of his resignation from the Company in

May 2021.

19.     Wade's position with Climate Pros was significant, and he was a critical employee

of Climate Pros.

20.     As Regional Director of Construction, Wade was responsible for, among other

things, driving the profitability of the Company in the assigned region and achieving expected

business results, outstanding key performance indicators (KPIs), accurate forecasting and

workforce planning, and a high level of employee engagement and productivity.

21.     As such, Wade's responsibilities included but were not limited to the following: partnering with the Regional Vice President to drive regional initiatives and ensure the Company's financial objectives were met; collaborating on strategic opportunities and assisting the Construction Managers in achieving the Company's goals; identification and prioritization of construction requirements with an objective of maintaining and driving construction operations profitability; driving KPIs for Construction Managers to ensure operational efficiency; preparing and participating in weekly, monthly, quarterly business reviews; identifying opportunities to improve process and productivity; and managing and addressing customer issues.

22.     As a result of his high-level position with the Company, Wade was intimately familiar with Climate Pros' confidential and trade secret information including, but not limited to, financial data regarding volumes of business and profitability of the Company's branch offices in Texas, business strategies, financial and business projections, master files (providing average costs per unit, current costs per unit, and highest costs per unit), existing bids on all projects, bid sheets, actual job performance and budget plans, pricing and margins per customer, customer and vendor contact information, and other confidential information pertaining to valuable, special, or unique aspects of Climate Pros' business activities.

23.     As part of his job duties, Wade also participated in confidential meetings, where Climate Pros business strategies were discussed and created.

24.     As one non-limiting example, Wade participated in the Company's leadership summit that took place in Dallas on May 12-14, 2021, at which the Company's CEO shared Climate Pros' sensitive information on strategy, operating trade secrets, and future growth and vision.  The invitation to the summit was limited to the Company's leaders.

25.    The information to which Wade had access as part of his job at Climate Pros constitutes commercially valuable information, is the subject of Climate Pros' efforts to maintain secrecy or confidentiality and is not reasonably ascertainable through lawful means.

26.    Wade would have been denied intimate access to Climate Pros' highly confidential, competitively sensitive information but for his execution of the Wade Agreement as defined below and position of trust and confidence with Climate Pros.  Only those people in a need-to-know position at Climate Pros are given access to such information.

27.    Wade was a highly compensated employee at Climate Pros.

28.    As a result of his high position with the Company, Wade owed the Company a fiduciary duty including an undivided duty of loyalty to act in the Company's best interests, not to compete with the Company during his employment with the Company, not to divert business opportunities from the Company, and safeguarding the Company's confidential and competitive business information and returning and not using such information at the end of his employment with the Company.

29.    Due to the critical position of Wade and to further protect the Company's confidential business information, business relationship with the clients, and goodwill, at the time of the purchase of assets and liabilities of Tri-Temp by Climate Pros, Wade and Climate Pros, entered into Confidential Information, Non-competition and Cooperation, Non-solicitation Agreement ("Wade Agreement").  Climate Pros has not been able to locate a signed copy of the Wade Agreement and suspects that Wade is in possession of the signed copy and that Wade removed the signed copy of the Agreement at the time of her resignation from the Company.  An unsigned copy of the Wade Agreement is attached hereto as **Exhibit A.**

30.     As part of consideration for entering into the Wade Agreement, and in addition to employment with the Company, payment of compensation, and other employment-related benefits, Climate Pros provided Wade with access to the Company's confidential information and Wade obtained the knowledge of such confidential information.

31.     Under the Agreement, Wade agreed to certain post-employment restriction, including to limited noncompetition and non-solicitation restrictions:

> During the Employee's employment with the Company and for a period of twenty four (24) months following the termination of the Employee's employment for any reason (the "Restricted Period"), the Employee (i) will not, directly or indirectly, whether as an owner, director, officer, affiliate, creditor, partner, shareholder, consultant, agent, principal, employee, employer, co-venturer or otherwise in any individual or representative capacity, engage, participate, assist, hold any interest in, or invest in any Competing Business (as hereinafter defined) which is located or transacts business in Illinois, Michigan, Wisconsin, Indiana, Hawaii, Florida or any other geographical area that the Company may add to its portfolio during the term of the Employee's employment; (ii) will refrain from directly or indirectly employing, attempting to employ, recruiting or otherwise soliciting or inducing (or assisting others in soliciting, inducing or influencing) any person to leave employment with the Company and/or to terminate his or her remunerative relationship with the Company as an agent or consultant of/to the Company (other than terminations of employment of subordinate employees undertaken in the course of the Employee's providing of services to the Company); and (iii) will refrain from directly or indirectly soliciting (or assisting others in soliciting) any Company customer (which includes prospective customers being actively solicited by the Company at the time) which Employee provided service to, or which Employee had personal contact with, during the last twenty-four (24) months of his employment with the Company to terminate or otherwise modify adversely its business relationship with the Company. The Employee understands that the restrictions set forth in this Section 7(d) are intended to protect the Company interest in its Confidential and Proprietary Information and established employee, customer and supplier relationships and goodwill, and agrees that such restrictions are reasonable and appropriate for this purpose. For purposes of this Agreement, the term "Competing Business" shall mean any business or company that principally engages in the Company Business and any other business in which the Company engages in during the term of the Employee's employment.

32.     Climate Pros has performed its obligations under the Wade Agreement.

**Elson's Duties at Climate Pros and Her Access to Climate Pros' Confidential and Trade Secret Information.**

33.     On May 1, 2019, Climate Pros purchased assets of Norfoxx Refrigeration, LLC ("Norfoxx").

34.     Prior to the acquisition of Norfoxx by Climate Pros, Elson had been employed by Norfoxx.

35.     Following the acquisition, Elson became an executive of Climate Pros assuming a role of Office Manager of the Company's Austin branch office.

36.     On July 12, 2021, Climate Pros promoted Elson to the position of Regional Operations Manager.

37.     Elson's positions with Climate Pros, both as Office Manager and Regional Operations Manager, were significant, and she was a critical employee of Climate Pros.

38.     As Regional Operations Manager, Elson was responsible for, among other things, driving the profitability of the Company in the assigned region and achieving expected business results, outstanding KPIs, accurate forecasting and workforce planning, and a high level of employee engagement and productivity.

39.     As such, Elson's responsibilities included but were not limited to the following: partnering with the Regional Vice President to drive regional initiatives and ensure the Company's financial objectives were met; collaborating on strategic opportunities and assisting the Branch Managers in achieving the Company's goals; identification and prioritization of construction requirements with an objective of maintaining and driving construction operations profitability; driving KPIs for Branch Managers to ensure operational efficiency; preparing and participating in weekly, monthly, quarterly business reviews; identifying opportunities to improve process and productivity; managing and addressing customer issues.

40.     As a result of her high-level position with the Company, Elson was intimately familiar with Climate Pros' confidential and/or trade secret information including, but not limited to, financial data regarding volumes of business and profitability of the Company's branch offices in Texas, business strategies, financial or business projections, master files (providing average costs per unit, current costs per unit, and highest costs per unit), pricing and margins per customer, customer and vendor contact information, and other confidential information pertaining to valuable, special, or unique aspects of Climate Pros' business activities.

41.     As part of her job duties, Elson also participated in confidential meetings, where Climate Pros business strategies were discussed and created.

42.     Like Wade, Elson was also invited and participated in the Company's leadership summit that took place in Dallas on May 12-14, 2021, where the Company's confidential information was presented and discussed.

43.     The information to which Elson had access as part of her job at Climate Pros constitutes commercially valuable information, is the subject of Climate's efforts to maintain secrecy or confidentiality and is not reasonably ascertainable through lawful means.

44.     Elson would have been denied intimate access to Climate Pros' highly confidential, competitively sensitive information but for her execution of the Elson Agreement as defined below and position of trust and confidence with Climate Pros.  Only those people in a need-to-know position at Climate Pros are given access to such information.

45.     Elson was a highly compensated employee at Climate Pros.

46.     As a result of her high position with the Company, Elson owed the Company a fiduciary duty including an undivided duty of loyalty to act in the Company's best interests, not to compete with the Company during her employment with the Company, not to divert business

opportunities from the Company, and safeguarding the Company's confidential and competitive business information and returning and not using such information at the end of her employment with the Company.

47.    Due to the critical position of Elson and to further protect the Company's confidential business information, business relationship with the clients, and goodwill, at the time of the purchase of assets and liabilities of Norfoxx by Climate Pros, Elson and Climate Pros, as a successor of Norfoxx, entered into Confidentiality and Stay Bonus Agreement ("Elson Agreement"). Climate Pros has not been able to locate a signed copy of the Elson Agreement and suspects that Elson is in possession of the signed copy and that Elson removed the signed copy of the agreement at the time of her resignation from the Company. An unsigned copy of the Elson Agreement is attached hereto as **Exhibit B.**

48.    Climate Pros has performed its obligations under the Elson Agreement by paying Elson the stay bonus, which she has accepted.

49.    Under the Elson Agreement, Climate Pros has made and agreed to make available to Elson certain Proprietary Information, as defined in the Elson Agreement, and provided to Elson salary, bonuses, and other benefits of employment with the Company, and provided Elson with the access to Proprietary Information specified in the Elson Agreement.

50.    "Proprietary Information" in the Elson Agreement is defined as "information regarding the Company, its subsidiaries and affiliates, including without limitation, financial information, information regarding business plans, operations, strategies, suppliers, vendors, pricing, and product plans, and, from time-to-time, its proprietary products and other proprietary information, specifically including, but not limited to, knowledge of the potential or actual acquisition of the Company." Exh. B, Sec. 1.

51.    Elson agreed "to use the Proprietary Information solely for the purpose of providing services to the Company, that the Proprietary Information will be kept confidential, and that [Elson] will not disclose any of the Proprietary Information or in any manner whatsoever except as contemplated [in the Elson Agreement]." Exh. B. Sec. 3.

52.    Section 5 of the Elson Agreement provides that at the termination of Elson's employment with the Company, Elson "shall immediately deliver all Proprietary Information (including all copies, extracts or summaries thereof) to the Company."

53.    In Section 6 of the Elson Agreement, Elson agreed to certain limited non-solicitation restrictions providing in relevant part as follows:

> during the period of Employee's employment by the Company and for a period of one (1) year thereafter (hereinafter the "Protected Period"), except where such actions are taken within the course and scope of Employee's employment with the Company and in a manner the Employee reasonably believes to be in the best interests of the Company, Employee will not, directly or indirectly, individually, on Employee's own behalf or on behalf of another or through a corporate or other business entity, (i) contact or otherwise communicate with any customer or supplier on whom Employee called, with whom Employee communicated and/or as to whom Employee provided any services or reviewed any information as a result of Employee's employment with the Company within the preceding twelve (12) months or, where Employee's employment with the Company has terminated, in the twelve (12) months prior to the date his/her employment with the Company terminated (hereinafter, a "Protected Customer/Supplier"); or (ii) influence or attempt to influence any Protected Customer/Supplier to divert its business to any individual, partnership, firm, corporation or other entity then in competition with the business of the Company or any subsidiary or affiliate of the Company.

Exh. B, Sec. 6.

54.    In Section 8 of the Elson Agreement, Elson agreed to certain limited non-competition restrictions:

> To further ensure the confidentiality of the Company's Proprietary Information, and protect the Company's employee, customer and supplier related goodwill, Employee shall not directly or indirectly (whether for compensation or otherwise), alone or as a partner, associate, agent, principal, trustee, consultant, co-venturer, creditor, owner (excepting not more than 1% stockholdings for investment

purposes in securities of publicly held and traded companies), representative, or in any other capacity, engage in, take any action constituting or in furtherance of, participate with or become interested in or associated with any person, firm, partnership, corporation or other entity which is then in, or has expressed to Employee the possibility of entering into, competition with the Company anywhere in the State of Texas, (i) during the period of Employee's employment by the Company, or (ii) during the one year period thereafter, unless such person, firm, partnership, corporation or other entity began operations, or was formed prior to April 1, 2019.

Exh. B, Sec. 8.

55.     Elson acknowledged that the foregoing covenants are appropriate and reasonable.

Exh. B, Sec. 10.

56.     Elson also agreed that if she committed a breach, or threatened to commit a breach, of any of the provisions of the Elson Agreement, Climate Pros shall have the right and remedy to require Elson to account for and pay over to the Company all compensation, profits, monies, accruals, increments or other benefits derived or received, directly or indirectly, by Elson as a result of any transactions constituting a breach of any of the provisions of the Elson Agreement. Exh. B, Sec. 11.

57.     The Elson Agreement also provides that Climate Pros "shall be entitled to equitable relief, including injunction and specific performance, as a remedy for any [breach of the Elson Agreement], without having to post any bond or any other form of security, without having to show any likelihood or irreparable harm, and without having to prove that money damages would be an inadequate remedy." Exh. B, Sec. 12.

58.     The Elson Agreement is governed and construed in accordance with the laws of the State of Texas.  Exh. B, Sec. 15.

59.     Elson also contractually agreed to the jurisdiction of this Court.  Exh. B, Sec. 15.

**Wade resigns from Climate Pros, then his replacement and Elson resign.**

60.    On March 26, 2021, Wade informed Climate Pros that he wanted to leave the Company because, he stated, he did not enjoy working at a large company and because he was tired of frequent work travel.

61.    Desiring to keep Wade, Climate Pros took steps and addressed Wade's concerns by reducing his travel commitments and allowing him to just manage the Company's Houston branch office, something that Wade did before his promotion to the Regional Director role.

62.    The Company did not reduce Wade's compensation and allowed to keep his title. Wade decided to stay.

63.    Yet, on May 18, 2021, Wade announced his resignation from the Company providing a one-week notice via e-mail.  At the time of his announced resignation, Wade spoke with Martin Hamilton, Climate Pros' Vice President of Construction, and informed him that he wanted to leave and that he was going to start his own business.

64.    On May 20, 2021, Wade recommended to the Company that it should promote Joe Loomis ("Loomis"), his long-time friend and a colleague, as his replacement.   At that time, Loomis held the position of a General Construction Manager with the Company.

65.    Wade's last day of employment with Climate Pros was May 25, 2021.

66.    Less than a week later, on May 31, 2021, Climate Pros promoted Loomis to the Regional Director position.

67.    Loomis assumed the duties and responsibilities that previously were assigned to Wade.

68.    However, just two months later, in the end of July 2021, Loomis also abruptly announced his resignation.

69.    Loomis' last day of employment with Climate Pros was August 3, 2021.

70.     Approximately one week later, Loomis was spotted working a job with Wade on behalf of Wade's new company.

71.     In the meantime, on August 12, 2021, Elson sent an email to Max Smith, Climate Pros' Regional Vice President and her direct boss, announcing her decision to resign from the Company. Elson proposed September 3, 2021, to be her last day of employment.

72.     The announcement of Elson's resignation was made to the employees of Climate Pros on August 17, 2021.

73.     Between August 12, 2021, and September 3, 2021, Elson had numerous conversations with the Company's employees during which she stated that she was leaving to join her brother in his construction business, which was non-competitive to Climate Pros as it involved remodeling offices in high rise buildings.

74.     A few days after she announced her leaving, Elson also had a discussion with Todd Ernest, Climate Pros' CEO, who asked her directly if she was going to work with Wade. Elson responded, "What makes you think that?" and reiterated once again that she was going to work for her brother's company.

75.     Oddly, shortly before her departure from the Company, Elson made a request to the Company for permission to print certain information relating to Climate Pros' existing bid pricing. The Company denied the request.

76.     Elson's last day of employment with Climate Pros was September 3, 2021.

**Climate Pros Discovers that Wade and Elson Operate a Competing Business Serving Climate Pros' Clients.**

77.     Following Elson's departure on September 3, 2021, Climate Pros started to receive unsettling rumors that Wade, Loomis, and Elson were now working together at Wade's new company and targeting Climate Pros' customers.

14

78.     H-E-B Grocery Company, LP ("H-E-B") is a privately held supermarket chain based in San Antonio, Texas, with more than 340 stores throughout Texas, as well as in northeast Mexico.

79.     H-E-B is one of the major customers of Climate Pros.

80.     During their tenure at Climate Pros, both Wade and Elson serviced the H-E-B account, including in the last twelve months of their respective employments at Climate Pros.

81.     Specifically, Elson worked closely with H-E-B, dealing with business issues, invoice disputes, and other related matters.

82.     Wade, as Regional Director, participated in meetings with H-E-B discussing construction contracts and business plans, and oversaw performance of construction jobs for H-E-B.

83.     On September 27, 2021, or more than three weeks after Elson's departure from Climate Pros, Ms. Julie Healy of H-E-B sent an e-mail to Mr. Wes Seagroves at Trakref, a company offering refrigerant management software, informing him that Defendant Alliance Services was a new vendor working with H-E-B and acknowledging that Amanda Elson had already contacted Trakref.

84.     Ms. Healy copied Elson on the e-mail; however, she (perhaps accidentally) sent it to Elson's Climate Pros' work e-mail at amanda.elson@climatepros.com, where it was discovered by Climate Pros.

85.     According to the records of the Texas Secretary of State, Alliance Services was registered on May 7, 2021, as a Texas limited liability company, with Wade listed as its managing member and registered agent and his home address at 23800 Lloyd Lane, Hockley, Texas 77447 listed as the company's address.

86.    According to the records of the Texas Secretary of State, on March 17, 2021, an individual named Gregory Michael Wade residing at 23800 Lloyd Lane, Hockley, Texas 77447 submitted an application for name reservation on behalf of Alliance Refrigeration of Texas, LLC with the Texas Secretary of State.

87.    Alliance Services' domain name at "asotx.com" was registered on May 16, 2021.

88.    After discovering the evidence of Wade, Elson, and Alliance Services unfairly competing with Climate Pros, the Company hired legal counsel and a forensic computer expert and launched an investigation relating to the circumstances of Wade's and Elson's departures, including by forensically examining their work computers.

89.    The forensic review of Elson's work computer revealed that on June 5, 2021, while still employed by Climate Pros, Elson sent an e-mail to Wade advising Alliance Services on how to more effectively compete for customers ("I was playing around writing stuff last night and it's not much but…. A few Tri-Temp guys decided to keep the customer relationship strong and carry on…we developed Alliance Services of TX and want to carry that tradition on.")

90.    Wade liked the idea responding two days later "I defiantly [sic] like it and we need to incorporate it on the webpage."

91.    Without disclosing to Climate Pros her association with Wade and Alliance Services, and while continue to be employed and compensated by Climate Pros, Elson actively assisted Alliance Services to operate and compete with Climate Pros.

92.    Elson duplicitous activities are further manifested by her lying to the Company's management and employees at the time of her announced resignation that she was going to join her brother's business, when in fact she was going to join Alliance Services, the company for

which she acted as an agent as early as June 5, 2021, while still being an executive of Climate Pros and receiving compensation from the Company.

### Climate Pros Discovers Misappropriation of Its Confidential and Trade Secret Information by Elson and Alliance Services.

93.     The forensic investigation also revealed that on July 29, 2021, at 7:07 p.m., a Sony Storage Media USB Device with a Serial Number 5A09112344160&0 ("Sony USB Device") and the Associated User Account "aelson" was connected to Elson's work computer and the document "HEB MSA – CP.pdf" was accessed and opened.

94.     "HEB MSA – CP.pdf" is a confidential document of Climate Pros.  It is a copy of the Master Services Agreement between Climate Pros and H-E-B ("H-E-B Master Services Agreement").  Exhibit D to the H-E-B Master Services Agreement contains confidential business information of Climate Pros such as rates of Climate Pros' technicians and helper technicians (standard hours rates, overtime hours rates, holiday and weekend rates), Climate Pros' Mark-on-Cost Pricing Methodology, and a table of show up fees (SUF) per location.

95.     At the conclusion of her employment, Elson did not return to Climate Pros the Sony USB Device from which she accessed the H-E-B Master Services Agreement on July 29, 2921.  As part of its investigation, Climate Pros searched its offices and files for the Sony USB Device and has not located it.

96.     Elson misappropriated the H-E-B Master Services Agreement, which contains Climate Pros' trade secrets.

97.     Access to Climate Pros' highly confidential documents, including but not limited to the H-E-B Master Services Agreement, would be a windfall to a competitor, such as Alliance Services, providing it with an enormous and unfair competitive advantage regarding, among other

things, allowing them to know of Climate Pros' financial data, existing rates, methodology for calculation of mark-ups, and the overall strategy of the Company.

98.    There was no Climate Pros business reason for Elson to remove Climate Pros' highly confidential documents, including but not limited to the H-E-B Master Services Agreement.

99.    Further, on August 2, 2021 at 8:23 p.m., Elson also sent a Climate Pros' document, an Excel spreadsheet named "FM Store Assigment for all Regions 08 02 202 Update.xlxs" ("H-E-B Store Assignment"), to her personal e-mail at aelson0879@hotmail.com containing information regarding H-E-B's store locations, square footage of the premises occupied, customer contact information, and other related information.

100.    Elson had no business need to send this document to her personal e-mail account while knowing that she was on the way out of the Company and were going to join a direct competitor of Climate Pros, to which she was already secretly providing assistance. This conduct was not in Climate Pros' interest and was against Climate Pros' interest.

101.    Elson misappropriated the Company's trade secrets contained in the H-E-B Store Assignment document.

102.    Upon information and belief, Elson removed the H-E-B Master Services Agreement and H-E-B Store Assignment to use and disclose them at her new employment at Alliance Services and to the benefit of Alliance Services.

103.    The full extent of Climate Pros' trade secrets misappropriated by Elson and Alliance Services is not yet fully known as Climate Pros' investigation continues.

## FIRST CAUSE OF ACTION
### *(Breach of the Wade Agreement)*
**(against Wade)**

104.    Climate Pros incorporates by reference its allegations above as if fully re-written.

105.    A valid agreement exists between Climate Pros and Wade containing certain post-employment restrictions that Wade promised to comply with in exchange for consideration.

106.    Under the Wade Agreement, Wade agreed that for two years after termination of his employment with Climate Pros, he will not "engage, participate, assist, hold any interest in, or invest in any Competing Business, as defined in the Wade Agreement, which is located or transacts business in Illinois, Michigan, Wisconsin, Indiana, Hawaii, Florida or any other geographical area that the Company may add to its portfolio during the term of [his] employment".

107.    During Wade's employment with Climate Pros, Climate Pros had in its portfolio Competing Business in Texas, which Wade had the responsibility to manage and develop.

108.    Under the Wade Agreement, Wade also agreed that for two years after termination of his employment with Climate Pros, he "will refrain from directly or indirectly employing, attempting to employ, recruiting or otherwise soliciting or inducing (or assisting others in soliciting, inducing or influencing) any person to leave employment with the Company and/or to terminate his or her remunerative relationship with the Company as an agent or consultant of/to the Company …"

109.    Under the Wade Agreement, Wade also agreed that for two years after termination of his employment with Climate Pros, he "will refrain from directly or indirectly soliciting (or assisting others in soliciting) any Company customer … which Employee provided service to, or which Employee had personal contact with, during the last twenty-four (24) months of

his employment with the Company to terminate or otherwise modify adversely its business relationship with the Company."

110.    Wade has breached his Agreement by, as set forth in this Complaint, and among other things, doing business in competition with Climate Pros in Texas, and with customers of Climate Pros that Wade worked with on behalf of Climate Pros.

111.    As a result of Wade's actions, Climate Pros has been damaged in the amount to be determined at trial.

## SECOND CAUSE OF ACTION
### *(Breach of Section 5 of the Elson Agreement)*
**(against Elson)**

112.    Climate Pros incorporates by reference its allegations above as if fully re-written.

113.    A valid agreement exists between Climate Pros and Elson containing certain obligations that Elson promised Climate Pros to comply with in exchange for consideration.

114.    Under Section 5 of the Elson Agreement, at the termination of her employment with the Company, Elson was required immediately to deliver "all Proprietary Information (including all copies, extracts or summaries thereof) to the Company."

115.    Elson has breached Section 5 of her Agreement by, as set forth in this Complaint, failing to deliver all Proprietary Information to the Company, including, but not limited to H-E-B Master Services Agreement and H-E-B Store Assignment.

116.    As a result of Elson's actions, Climate Pros has been damaged in the amount to be determined at trial.

## THIRD CAUSE OF ACTION
### *(Breach of Section 6 of the Elson Agreement)*
**(against Elson)**

117.    Climate Pros incorporates by reference its allegations above as if fully re-written.

118.    A valid agreement exists between Climate Pros and Elson containing certain post-employment restrictions that Elson promised to comply with in exchange for consideration.

119.    Under Section 6 of the Elson Agreement, for one year after Elson's employment with Climate Pros, Elson is prohibited to "(i) contact or otherwise communicate with any customer or supplier on whom [she] called, with whom [she] communicated and/or as to whom [she] provided any services or reviewed any information as a result of [her] employment with the Company within the preceding twelve (12) months … (hereinafter, a "Protected Customer/Supplier") or (ii) influence or attempt to influence any Protected Customer/Supplier to divert its business to any individual, partnership, firm, corporation or other entity then in competition with the business of the Company or any subsidiary or affiliate of the Company."

120.    Elson breached Section 6 of her Agreement by, as set forth in this Complaint, contacting or otherwise communicating with a Protected Customer, including but not limited to H-E-B, within a year after termination of her employment with Climate Pros.

121.    Elson also breached Section 6 of her Agreement by, as set forth in this Complaint, influencing or attempting to influence a Protected Customer, including but not limited to H-E-B, to divert its business to Alliance Services, a competitor of Climate Pros.

122.    As a result of Elson's actions, Climate Pros has been damaged in the amount to be determined at trial.

### FOURTH CAUSE OF ACTION
*(Breach of Section 8 of the Elson Agreement)*
**(against Elson)**

123.    Climate Pros incorporates by reference its allegations above as if fully re-written.

124.    A valid agreement exists between Climate Pros and Elson containing certain post-employment restrictions that Elson promised to comply with in exchange for consideration.

125.    In accordance with Section 8 of the Elson Agreement, during her employment with Climate Pros or during the one year period thereafter, Elson was prohibited to "engage in, take any action constituting or in furtherance of, participate with or become interested in or associated with any person, firm, partnership, corporation or other entity which is then in, or has expressed to [Elson] the possibility of entering into, competition with the Company anywhere in the State of Texas."

126.    Elson breached Section 8 of her Agreement by, as set forth in this Complaint, among other things, engaging in, participating with, becoming interested in, and associated with Wade and Alliances Service to compete with Climate Pros in the State of Texas.

127.    Elson's wrongful actions, as described fully in this Complaint, took place during her employment with Climate Pros and within one year after termination of her employment with Climate Pros.

128.    As a result of Elson's actions, Climate Pros has been damaged in the amount to be determined at trial.

**FIFTH CAUSE OF ACTION**
*(Trade Secret Misappropriation Under the Defend Trade Secrets Act)*
**(against Elson and Alliance Services)**

129.    Climate Pros incorporates by reference its allegations above as if fully re-written.

130.    Climate Pros is the owner of valuable trade secrets related to products and services used in, or intended for use in, interstate or foreign commerce.  Such information includes but is not limited to the information contained in the H-E-B Master Services Agreement and the H-E-B Store Assignment.

131.    The information that Elson and Alliance Services misappropriated from Climate Pros, including, but not limited to, information contained in the H-E-B Master Services

Agreement and the H-E-B Store Assignment, is a "trade secret" as this term is defined under 18 U.S.C. § 1839(3).

132.    Climate Pros took affirmative steps to maintain the confidentiality of such information, which were reasonable under the circumstances.

133.    The information that Elson and Alliance Services misappropriated from Climate Pros, including, but not limited to, the information contained in the H-E-B Master Services Agreement and the H-E-B Store Assignment, derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

134.    Climate Pros derives great value from the fact that this information is not readily ascertainable by others, particularly competitors. The information provides a significant competitive advantage.

135.    Elson misappropriated Climate Pros' trade secrets by: 1) acquiring them through improper means, including, but not limited to, theft or breach of a duty to maintain secrecy of Climate Pros' trade secrets; and 2) disclosing or using Climate Pros' trade secrets without express or implied consent of Climate Pros.

136.    Alliance Services misappropriated Climate Pros' trade secrets by acquiring them through Elson, while knowing or having a reason to know that she obtained Climate Pros' trade secrets by improper means.

137.    Alliance Services also misappropriated Climate Pros' trade secrets by disclosing or using Climate Pros' trade secrets without Climate Pros' express or implied consent, when at the time of the disclosure or use, Alliance Services knew or had reason to know that the knowledge

of Climate Pros' trade secrets were:1) derived from Elson, who used improper means to acquire knowledge of Climate Pros' trade secrets; or 2) acquired under circumstances giving rise to a duty to maintain the secrecy of Climate Pros' trade secrets or limit the use of Climate Pros' trade secrets; or 3) derived from or through Elson who owed a duty to Climate Pros.

138.    Elson's and Alliance Services' misappropriation of Climate Pros' trade secrets and proprietary information constitutes a violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(1).

139.    Climate Pros has been and is being damaged by Elson's and Alliance Services' misappropriation of its trade secrets.  The damage to Climate Pros may include, but is not limited to, loss of information, loss of the secrecy of the information, lost customers, potential lost business opportunities, loss of employees and potential employees, and a disadvantaged market position.  These and other damages suffered by Climate Pros are irreparable.

140.    Elson's and Alliance Services' conduct has caused and will continue to cause irreparable harm for which Climate Pros has no adequate remedy at law. Elson and Alliance Services should be immediately enjoined from any continued use of Climate Pros' trade secrets and should be enjoined from sharing the unlawfully retained information with others, including Wade or any other employees of agents of Alliance Services.

141.    Climate Pros is entitled to an award of damages in the amount of Climate Pros' actual losses and Elson's and Alliance Services' unjust enrichment, including attorneys' fees and costs.

142.    Elson's and Alliance Services' duplicitous activities to misappropriate Climate Pros' trade secrets constitute willful and malicious conduct warranting an award of exemplary damages.

## SIXTH CAUSE OF ACTION
### *(Trade Secret Misappropriation Under the Texas Uniform Trade Secrets Act)*
### (against Elson and Alliance Services)

143.    Climate Pros realleges and incorporates all previous paragraphs of the Complaint as if fully set forth here.

144.    The information that Elson and Alliance Services misappropriated from Climate Pros, including, but not limited to, the information contained in the H-E-B Master Services Agreement and the H-E-B Store Assignment, derives independent economic value for Climate Pros, actual or potential, from not being generally known to, and not being readily ascertainable by proper means, by other persons who can obtain economic value from its disclosure or use.

145.    The information that Elson and Alliance Services misappropriated from Climate Pros, including, but not limited to, information contained in the H-E-B Master Services Agreement and the H-E-B Store Assignment, constitutes trade secrets as that term is defined under the Texas Uniform Trade Secret Act, Tex. Civ. Prac. and Rem. Code § 134A.001.

146.    Climate Pros took affirmative steps to maintain the confidentiality of such information, which were reasonable under the circumstances.

147.    Elson misappropriated Climate Pros' trade secrets by: 1) acquiring them through improper means, including, but not limited to, theft and breach of a duty to maintain secrecy of Climate Pros' trade secrets; and 2) disclosing or using Climate Pros' trade secrets without express or implied consent of Climate Pros.

148.    Alliance Services misappropriated Climate Pros' trade secrets by acquiring them through Elson, while knowing or having a reason to know that she obtained Climate Pros' trade secrets by improper means.

149.    Alliance Services also misappropriated Climate Pros' trade secrets by disclosing or using Climate Pros' trade secrets without Climate Pros' express or implied consent, when at the time of the disclosure or use, Alliance Services knew or had reason to know that the knowledge of Climate Pros' trade secrets were:1) derived from Elson, who used improper means to acquire knowledge of Climate Pros' trade secrets; or 2) acquired under circumstances giving rise to a duty to maintain the secrecy of Climate Pros' trade secrets or limit the use of Climate Pros' trade secrets; or 3) derived from or through Elson who owed a duty to Climate Pros.

150.    The conduct of Elson and Alliance Services was duplicitous and motivated by intent to serve their own personal benefit and not the benefit of Climate Pros.

151.    As a proximate result of their actions, Elson and Alliance Services have reaped the benefits due to Climate Pros and have been unjustly enriched.

152.    Elson and Alliance Services are directly liable for trade secret violations under Texas law.

153.    Climate Pros has been and is being damaged by Elson's and Alliance Services' misappropriation of its trade secrets. The damage to Climate Pros may include, but is not limited to, loss of information, loss of the secrecy of the information, lost customers, potential lost business opportunities, loss of employees and potential employees, and a disadvantaged market position. These and other damages suffered by Climate Pros are irreparable.

154.    Climate Pros is entitled to compensatory damages in an amount to be determined at trial. In light of the willfulness and maliciousness of the conduct of Elson and Alliance Services, Climate Pros is entitled to exemplary damages and its attorneys' fees pursuant to applicable law.

## SEVENTH CAUSE OF ACTION
### *(Tortious Interference with Contractual Relationships)*
### (against Alliance Services)

155.     Climate Pros realleges and incorporates all paragraphs of the Complaint as if fully set forth herein.

156.     Climate Pros had valid and enforceable contractual relationships with Wade and Elson and as set forth in the Wade Agreement and Elson Agreement.

157.     Climate Pros also had valid and enforceable contractual relationships with its customers, including, but not limited to, H-E-B.

158.     Alliance Services was aware of such contractual relationships.

159.     Alliance Services intentionally and willfully interfered with these relationships by employing Wade and Elson in violation of their agreements and allowing them to engage in unfair competition with Climate Pros for customers.

160.     As a result of Alliance Services' intentional and willful interference, Climate Pros has been damaged.

161.     A causal connection exists between the interference and the damages.

162.     Alliance Services was not justified or privileged to interfere.

163.     In committing the foregoing acts, Alliance Services acted willfully and maliciously towards Climate Pros and with conscious indifference to the rights of Climate Pros.

## PRAYER FOR RELIEF

WHEREFORE, Climate Pros requests that this Court enter judgment against the Defendants awarding:

A.     Judgment against the Defendants for monetary damages;

B.      Judgment in Climate Pros' favor against the Defendants on all causes of action alleged in the Complaint;

C.      Accounting and return of all documents removed/misappropriated by the Defendants;

D.      Accounting and return of all compensation, profits, monies, accruals, increments or other benefits derived or received by Elson as a result of any transactions constituting a breach of any of the provisions of the Elson Agreement;

E.      Exemplary/punitive damages;

F.      Attorneys' fees and costs; and

G.      Such other relief as the Court may deem just and equitable.

**PLAINTIFF DEMANDS TRIAL BY A 12-PERSON JURY.**

Dated this 8th day of March, 2022.         Respectfully Submitted,

**MICHAEL BEST & FRIEDRICH LLP**


By: */s/ Lance A. Hevizy*
_____

      LANCE A. HEVIZY
      TX SBN 24032418
      *lahevizy@michaelbest.com*
      620 Congress Avenue, Suite 200
      Austin, TX 78701
      T. 512.320.0601
      F. 512.640.3170

      ERIC H. RUMBAUGH[1], Attorney-in-Charge
      WI SBN 1015164
      *ehrumbaugh@michaelbest.com*
      VICTOR J. ALLEN[2]
      WI SBN 1081361
      *vjallen@michaelbest.com*
      790 N. Water Street, Suite 2500
      Milwaukee, WI 53202
      T. 414.271.6560
      F. 414.277.0656


ATTORNEYS FOR PLAINTIFF CLIMATE PROS, LLC

---

[1] Motion for Admission Pro Hac Vice is forthcoming.

[2] Motion for Admission Pro Hac Vice is forthcoming.